## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| MARCUS LANSKEY, derivatively on behalf of MEDICAL PROPERTIES TRUST, INC., <br><br> Plaintiff, <br><br> v. <br><br> EDWARD K. ALDAG, JR., J. KEVIN HANNA, R. STEVEN HAMNER, G. STEVEN DAWSON, CATERINA A. MOZINGO, EMILY W. MURPHY, ELIZABETH N. PITMAN, D. PAUL SPARKS, JR., MICHAEL G. STEWART, and C. REYNOLDS THOMPSON, III, <br><br> Defendants, and <br><br> MEDICAL PROPERTIES TRUST, INC., <br><br> Nominal Defendant. | Case No.: 1:24-cv-00471 <br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Marcus Lanskey ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Medical Properties Trust, Inc. ("Medical Properties" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Edward K. Aldag, Jr. ("Aldag"), J. Kevin Hanna ("Hanna"), R. Steven Hamner ("Hamner"), G. Steven Dawson ("Dawson"), Caterina A. Mozingo ("Mozingo"), Emily W. Murphy ("Murphy"), Elizabeth N. Pitman ("Pitman"), D. Paul Sparks, Jr. ("Sparks"), Michael G. Stewart ("Stewart"), and C. Reynolds Thompson, III ("Thompson") (collectively, the "Individual Defendants" and together with Medical Properties, "Defendants") for breaches of their fiduciary duties as directors and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, contribution and indemnification, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings, press releases, legal filings, news reports, securities analysts' report, information readily obtainable on the Internet, and other publicly available documents regarding the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing by the directors and officers of Medical Properties from July 15, 2019, to January 5, 2024, both dates

inclusive (the "Relevant Period").

2.      Medical Properties is a real estate investment trust ("REIT") headquartered in Birmingham, Alabama that purchases and develops healthcare facilities both domestically and internationally. Founded in 2003 as a Maryland corporation, as of September 30, 2023, the Company has investments in 441 properties in 31 U.S. states, seven countries in Europe, one country in South America, and in Australia.. Medical Properties purchases and develops hospital facilities on a "net lease" basis, whereby the Company owns the buildings and land and leases the facilities to medical providers. The Company's facilities cover a variety of healthcare settings, including general acute care hospitals, behavioral health facilities, inpatient physical rehabilitation facilities, long-term acute care hospitals, and freestanding emergency room/urgent care facilities.

3.      Medical Properties conducts substantially all of its operations through MPT Operating Partnership, L.P. ("MPT"), a Delaware limited partnership. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MPW."

4.      The Relevant Period begins on July 15, 2019, when Medical Properties announced that it had reached an agreement to acquire numerous hospitals and behavioral health facilities, including fourteen acute care hospitals and two behavioral health facilities (the "Prospect Facilities") which were owned and operated by Prospect Medical Holdings, Inc. ("Prospect"). The agreement provided that, following the purchase, the Company would own the Prospect Facilities outright and lease them back to Prospect. The Prospect Facilities included four acute care hospitals in Pennsylvania (collectively, the "Pennsylvania Facilities").

5.      Prior to the Relevant Period, the Company announced it had signed a definitive agreement for real estate interests of nine acute hospitals operated by Steward Health Care System ("Steward") on September 26, 2016. The agreement provided that the Company would invest

$1.25 billion in Steward through a real estate sale-leaseback transaction and acquisition of a limited equity stake in the Company.

6.      Throughout the Relevant Period, the Company engaged in a widespread scheme to hide from investors that, contrary to the Company's representations to the public, its asset portfolio was extremely troubled and underperforming, such that many of the Company's medical provider tenants could not timely make payments for leasing the Company's facilities. Indeed, throughout the Relevant Period, Medical Properties completed a series of "uncommercial transactions" to prop up its underperforming assets in the near term and, consequently, avoid recording impairment charges. These uncommercial transactions allowed the Company to improperly route cash to financially distressed healthcare facilities in the Company's portfolio, thereby circumventing Medical Properties' obligation under GAAP (defined below) to report impairment charges, while simultaneously creating the outward appearance that the Company's portfolio facilities could regularly make their lease payments.

7.      The truth began to emerge on January 26, 2023, when Viceroy Research LLC ("Viceroy"), a financial research investigative firm, released a report on Medical Properties entitled "Medical Properties (dis)Trust" (the "Viceroy Report"). The Viceroy Report reported that Medical Properties had "engaged in billions of dollars of uncommercial transactions with its tenants and their management teams in order to mask a pervasive revenue round-robin scheme and/or theft" and specifically described four types of transactions by which "substantial portions of cash is round-tripped back to [the Company]." The Company engaged in these uncommercial transactions to make it appear to investors that distressed tenants had positive payment histories, thereby allowing the Company to avoid recording impairment charges. These transactions included sale-leasebacks, cash giveaways, bailouts, and the use of fabricated expenses involving

fabricated projects to siphon away funds.

8.      The truth began to emerge on February 23, 2023, when, before the market opened, Medical Properties issued a press release which confirmed the findings in the Viceroy Report. The press release contained the Company's financial results for the fourth quarter of 2022 and for the fiscal year ended December 31, 2022 (the "Fiscal Year 2022") and revealed that Medical Properties was recording a $171 million write-down of assets pertaining to the Pennsylvania Facilities, in addition to a $112 million write-off of unbilled rent owed by Prospect concerning the Prospect Facilities, for a ***massive total impairment charge of $283 million***.

9.      On this news, the price per share of the Company's common stock fell $1.06, or approximately 8.7%, from closing at $12.20 per share on February 22, 2023, to close at $11.14 per share on February 23, 2023.

10.     However, Defendants' deceit did not end there. On January 4, 2024, the Company released further information, after the market had closed, showing that the Company continued its breach of fiduciaries duties by failing to adequately advise of the extent of its rent in arrears. Specifically, the Company announced that its largest tenant – Steward Health Care System ("Steward") – owed approximately $50 million of unpaid rent (exclusive of $50 million that was previously deferred). The Company further revealed it would record about $350 million of write-downs related to Steward, including a write-off of consolidated straight-line rent receivables of approximately $225 million and unpaid rent receivables of approximately $100 million.

11.     The Company further announced it had engaged Alvarez & Marsal Securities, LLC ("A&M") as its financial advisor and KTBS Law, LLP and Baker, Donelson, Bearman, Caldwell & Berkowitz, PC as legal advisors to advise the Company on its options to enable the recovery of uncollected rent and outstanding loans. Additionally, the Company announced the establishment

of a "transformation committee" comprised of newly appointed independent directors to help improve overall governance.

12. On this news, the price per share of the Company's common stock fell $1.45, or approximately 29%, from closing at $5 per share on January 4, 2024, to close at $3.55 per share on January 5, 2024.

13. The Individual Defendants' misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock price during the Relevant Period.

14. In further breach of their fiduciary duties to the Company, five of the Individual Defendants engaged in lucrative inside trading, ***selling over $58 million worth of common stock*** when the price of the Company's common stock was artificially inflated as a result of the Individual Defendants' misconduct.

15. At all relevant times, the Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain effective disclosure controls and procedures and adequate internal controls.

16. The Individual Defendants' misconduct is causing, and will continue to cause, the Company substantial harm. Even beyond the reputational damage and loss in market capitalization- the total cost to the Company and shareholders may well stretch into the millions of dollars. For example, the Company, its Chief Executive Officer, Chairman of the Board, and President, its Chief Financial Officer, and its Chief Accounting Officer are named defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Alabama (the "Securities Class Action").

17. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their participation in the wrongful conduct complained of herein, the substantial likelihood of the directors' liability in this derivative action and certain Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company, and thus demand is discussed as futile.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of

jurisdiction over them.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Company is incorporated in this District.

## PARTIES

### Plaintiff

25.     Plaintiff is a current shareholder of Medical Properties. Plaintiff has continuously held Company common stock at all relevant times, and currently owns 500shares of the Company. Plaintiff is a citizen of the United States and currently resides in Eugene, Oregon.

### Nominal Defendant Medical Properties

26.     Medical Properties is a Maryland corporation with its principal executive offices at 1000 Urban Center Drive, Suite 501, Birmingham, Alabama, 35242. The Company's common stock trades on the NYSE under the ticker symbol "MPW."

### Defendant Aldag

27.     Defendant Aldag has served as the Company's CEO and Chairman of the Board since 2004. Defendant Aldag co-founded the Company in 2003. He also serves as the Chair of the Investment Committee and as a member of the Environmental and Social Risk Committee. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 27, 2023 (the "2023 Proxy"), as of March 29, 2023, Defendant Aldag beneficially owned 3,116,010 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023, was $7.69, Defendant Aldag owned approximately $23,962,117 worth of Company stock at that time.

28.     From the fiscal year ended December 31, 2019 (the "Fiscal Year 2019") through

the fiscal year ended December 31, 2022 (the "Fiscal Year 2022") Defendant Aldag was awarded over $67,173,215 in salary, bonuses, stock awards, non-equity incentive plan compensation and other compensation from the Company.

29.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Aldag sold 1,827,939 shares of Company stock on inside information, for which he received approximately $27,610,481 in proceeds.

**Defendant Dawson**

30.     Defendant Dawson has served as a Company director since 2004. He also serves as the Chair of the Audit Committee and as a member of the Investment Committee. According to the 2023 Proxy, as of March 29, 2023, Defendant Dawson beneficially owned 123,336 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023, was $7.69, Defendant Dawson owned approximately $948,454 worth of Company stock at that time.

31.     For Fiscal Year 2019 through Fiscal Year 2022, Defendant Dawson received $1,018,618 in fees earned or paid in cash and stock awards.

32.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Dawson sold 7,476 shares of Company stock on inside information, for which he received approximately $135,091 in proceeds. Defendant Dawson sold 7,476 shares of Company stock on inside information, for which he received approximately $135,091 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

**Defendant Hanna**

33.    Defendant Hanna serves as the Company's Senior Vice President, Controller and CAO and has served as a Company employee since 2008. He personally signed the Form 10-Ks and Form 10-Qs during the Relevant Period.

34.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Hanna sold 50,500 shares of Company stock on inside information, for which he received approximately $1,053,910 in proceeds.

**Defendant Hamner**

35.    Defendant Hamner has served as a Company director since 2005 and as the Company's Executive Vice President and CFO since September 2003. He is also a member of the Investment Committee and the Risk Committee. According to the 2023 Proxy, as of March 29, 2023, Defendant Hamner beneficially owned 1,795,283 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023, was $7.69, Defendant Hamner owned approximately $13,805,726 worth of Company stock at that time.

36.    For Fiscal Year 2019 through Fiscal Year 2022, Defendant Hamner received $34,134,174 in salary, bonuses, stock awards, non-equity incentive plan compensation, and all other compensation.

37.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Thus, in total, before the fraud was exposed, he sold 902,500 shares of Company stock on inside information, for which he received approximately $18,575,025 in proceeds.

**Defendant Mozingo**

38.     Defendant Mozingo has served as a Company director since February 2020. She also serves as the Chair of the Environmental and Social Committee and as a member of the Risk Committee. According to the 2023 Proxy, as of March 29, 2023, Defendant Mozingo beneficially owned 26,396 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023, was $7.69, Defendant Mozingo owned approximately $202,985 worth of Company stock at that time.

39.     For Fiscal Year 2020 through Fiscal Year 2022, Defendant Mozingo received $704,570 in fees earned or paid in cash and stock awards.

**Defendant Murphy**

40.     Defendant Murphy has served as a Company director since February 2022. She also serves as a member of the Ethics Committee, the Nominating and Corporate Governance Committee, and the Environmental and Social Committee. According to the 2023 Proxy, as of March 29, 2023, Defendant Murphy beneficially owned 15,776 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023, was $7.69, Defendant Murphy owned approximately $121,317 worth of Company stock at that time.

41.     For Fiscal Year 2022, Defendant Murphy received $207,538 in fees earned or paid in cash and stock awards.

**Defendant Pitman**

42.     Defendant Pitman has served as a Company director since 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee, Chair of the Risk Committee,

as a member of the Ethics Committee, and as a member of the Environmental and Social Committee. According to the 2023 Proxy, as of March 29, 2023, Defendant Pitman beneficially owned 46,984 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023, was $7.69, Defendant Pitman owned approximately $361,307 worth of Company stock at that time.

43. For Fiscal Year 2019 through Fiscal Year 2022, Defendant Pitman received $958,618 in fees earned or paid in cash.

**Defendant Sparks**

44. Defendant Sparks has served as a Company director since 2014. He also serves as a member of the Audit Committee, Compensation Committee, and Investment Committee. According to the 2023 Proxy, as of March 29, 2023, Defendant Sparks beneficially owned 66,474 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023, was $7.69, Defendant Sparks owned approximately $511,185 worth of Company stock at that time.

45. For Fiscal Year 2019 through Fiscal Year 2022, Defendant Sparks received $983,618 in fees earned or paid in cash and stock awards.

**Defendant Stewart**

46. Defendant Stewart has served as a Company director since 2016. He also serves as a member of the Environmental and Social Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Ethics Committee. According to the 2023 Proxy, as of March 29, 2023, Defendant Stewart beneficially owned 224,111 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023, was $7.69, Defendant Stewart owned approximately $1,723,414 worth of

Company stock at that time.

47.     For Fiscal Year 2019 through Fiscal Year 2022, Defendant Stewart received $1,066,118 in fees earned or paid in cash and stock awards.

48.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Stewart sold 26,900 shares of Company stock on inside information, for which he received approximately $538,810 in proceeds.

**Defendant Thompson**

49.     Defendant Thompson has served as a Company director since 2016.He also serves as Chair of the Compensation Committee, as a member of the Audit Committee, and as a member of the Investment Committee. According to the 2023 Proxy, as of March 29, 2023, Defendant Thompson beneficially owned 45,253 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2023, was $7.69, Defendant Thompson owned approximately $347,996 worth of Company stock at that time.

50.     For Fiscal Year 2019 through Fiscal Year 2022, Defendant Thompson received $998,618 in fees earned or paid in cash and stock awards.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

51.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the Company's business and corporate affairs, the Individual Defendants each owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

52.     Each director and officer of the Company owes the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

53.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also the officers and directors of the Company, has been ratified by the remaining Individual Defendants, who at all relevant times collectively comprised a majority of the Board.

55.     As the senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate

and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

56.    To discharge their duties, the Company's officers and directors were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the Company's officers and directors were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of the United States, and pursuant to the Company's own Code of Ethics and Business Conduct (the "Code of Conduct"); conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(b)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(c)    establish and maintain systematic and accurate records and reports of the

business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(d)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(e)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(f)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(g)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57.      Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

58.      At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

59.      Because of their advisory, executive, managerial, and directorial positions with the

Company, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

60.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

61.     Individual Defendants owe fiduciary duties to the Company and its shareholders, including duties of loyalty, good faith, and candor. In addition, the Company's foundational corporate documents detail the requirements of the Board's duties as described herein.

62.     The Company's Code of Conduct, as revised in October 2023, provides in part as follows:

> Medical Properties Trust ("MPT" or the "Company") is amending and restating this Code of Ethics and Business Conduct (the "Code") for the purpose of deterring wrongdoing and promoting:
>
> •     Honest and ethical conduct, including ethical handling of conflicts of interest, anti-corruption, and bribery;
>
> •     Full, fair, accurate, timely and understandable disclosure in the Company's filings with the Securities and Exchange Commission, from and after the time the Company is required to make such filings, and other public communications;
>
> •     Compliance with applicable laws, rules and regulations;
>
> •     Prompt reporting of violations of the Code; and
>
> •     Accountability for adherence to the Code.
>
> **Honest and Ethical Conduct**
>
> 1. Scope
>
> Each director, officer, employee owes a duty to the Company to act in an honest and ethical manner and to abide by the letter and the spirit of all applicable laws, rules and regulations applicable wherever the Company does business. All directors, officers and employees of the Company are expected to be familiar with

the Code and to adhere to those principles and procedures set forth in the Code that apply to them.

The Company's Audit Committee of the Board of Directors (the "Audit Committee") is responsible for administering and interpreting the Code. The Audit Committee has delegated day-to-day responsibility for administrating and interpreting the Code to the Code of Ethics Contact Person. For purposes of this Code, the "Code of Ethics Contact Person" will be the Senior Vice President of Operations…

2.  Conflict of Interest

A "conflict of interest" exists whenever a person's private interests interfere or conflict in any way with the interests of the Company. Directors, officers and employees should conduct themselves in a manner that avoids even the appearance of a conflict of interest…

3.  Compliance

It is the Company's policy to comply with all applicable laws, rules and regulations. Each director, officer and employee is responsible for adhering to the standards and restrictions imposed by those laws, rules and regulations.

4.  Insider Trading

In the normal course of business, directors, officers and employees may have access to information that is not known to the public. Sometimes this inside information may also "materially" affect the market for the Company's stock. Directors, officers and employees with material inside information are subject to severe legal consequences for buying or selling, or for disclosing this information to others who buy or sell, Company stock before the information is public.

The courts say that information is material if there is a substantial likelihood that a reasonable investor would consider the information important in deciding whether or not to buy, sell or hold a company's securities. Directors, officers and employees may not act on this information or release it to anyone else, including relatives, friends, coworkers or stockbrokers, until this information has been disclosed publicly and the public has had time to react to it. Always consult the Company's Chief Executive Officer, Chief Financial Officer or Code of Ethics Contact Person before buying or selling Company stock if any doubt exists concerning the materiality of the information in your possession…

5.  Public Company Reporting

It is of critical importance that the Company's filings with the Securities and Exchange Commission ("SEC") and related public disclosures be accurate and

timely. Depending on his or her position with the Company, a director, officer or employee may be called upon to provide necessary information to assure that the Company's public reports are complete, fair and understandable. The Company expects directors, officers and employees to take their responsibility very seriously and to provide prompt, accurate answers to inquiries related to the Company's public disclosure requirements.

6. Sanctions; Disciplinary Actions

Violations of this code will not be condoned. Any employee who breaches this policy may face disciplinary action, which could result in dismissal for gross misconduct. Any non-employee who breaches this policy may have their contract terminated with immediate effect.

63. Defendants Dawson, Sparks, and Thompson (the "Audit Committee Defendants") comprise the Audit Committee. The Audit Committee's Charter provides that its purpose is to "assist the Board of Directors… in fulfilling its oversight responsibilities for (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements … and (4) the performance of the Company's internal audit function and independent auditors. The Committee will also assist the Board in monitoring the Company's compliance with the Code of Ethics and Business Conduct and in overseeing the Company's system of disclosure controls and procedures and internal controls over financial reporting."

64. The Committee's duties and responsibilities include "discuss[ing]with management and independent auditors significant financial reporting issues and judgment made in connection with preparation of the Company's financial statements, including significant changes in the selection or application of accounting principles, major issues as to the adequacy of internal controls, and any special steps adopted in light of material control deficiencies"; "review[ing] and discuss[ing] with management and the independent auditors the annual audited financial statements and quarterly financial statements, including the Company's specific disclosures in Management's Discussion and Analysis of Financial Condition and Results of Operations and the

results of the independent auditor's reviews of the quarterly financial statements, and recommend to the Board whether the annual audited financial statements should be included in any Form 10-K to be filed by the Company.

65.     The Audit Committee's Charter also states that the Committee shall discuss with management and the independent auditor "the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analyst and rating agencies" and "any published reports that raise material issues regarding the Company's financial statements or accounting policies."

66.     The Audit Committee's Charter also required that the Committee "review any significant matters contained in reports prepared by the internal auditing department and meet privately with the internal audit manager each quarter to discuss concerns relating to internal controls or accounting and auditing matters"; "meet with Company senior management periodically to review: major financial risk exposures; material legal issues; plans for disaster recovery, risk management activities, business issues which may affect financial results, ethical standards and conduct, Management Information Systems activities;" "discuss with management the Company's major financial risk exposure and the steps management has taken to monitor and control such exposure, including the Company's risk assessment and risk management policies;" and "monitor compliance of the Company's employees with its standards of business conduct and conflict of interest policies and review reports and disclosures of insider and affiliated party transactions.

67.     Defendants failed to meet their responsibilities and obligations under the Code of Conduct and Audit Committee Charter as set forth herein, including but not limited to the Defendants failure to maintain internal controls and failure to comply with applicable laws and

regulations." This illegal course of conduct constituted breaches of their fiduciary duties to the Company and resulted in significant harm to the Company.

68.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background*

69.     Medical Properties was incorporated in Maryland in 2003 as a REIT and is headquartered in Birmingham, Alabama. The Company's business model centers on acquiring and developing healthcare facilities and leasing those facilities to medical companies under long-term net leases. These leases generally mandate that the tenant shoulder a majority of the costs affiliated with the leased property.

70.     Although Medical Properties maintains 100% ownership of a majority of its leased assets, the Company also owns many of its properties through joint ventures with other partners. Indeed, in some instances, the Company furnishes mortgage loans to healthcare companies which are collateralized by the Company's real estate assets. In other instances, the Company provides healthcare companies with loans through taxable REIT subsidiaries ("TRS"), the proceeds of which are typically used for working capital and other purposes.

71.     Moreover, Medical Properties sometimes extends noncontrolling investments in its tenants as investments in unconsolidated operating entities. This type of investment is generally made together with bigger real estate deals with the tenant that permit Medical Properties to share in the tenant's profits and losses and also provide the Company with certain minority rights and protections.

72.     This business model allows Medical Properties to complete acquisitions and recapitalizations and strives to achieve the Company's purported goal of "allow[ing] operators of healthcare facilities to serve their communities by unlocking the value of their real estate assets to fund facility improvements, technology upgrades, and other investments in operations."

73.     As an REIT, Medical Properties emphasizes to investors two financial metrics, "funds from operations" ("FFO") and "normalized funds from operations" ("NFFO"). FFO allows investors to understand the cash flow of an REIT company. Since real estate values fluctuate over time, FFO is used to more accurately account for these changes. Generally, FFO is calculated by adding depreciation, amortization, and losses on sales of assets to earnings. Any gains on sales of assets and any interest income are then subtracted from the first figure. NFFO is adjusted FFO that accounts for unanticipated or non-core events or occurrences that would make comparison of FFOs across time inaccurate. The Company filed its annual report for Fiscal Year 2021 on Form 10-K with the SEC (the "2021 10-K") on March 1, 2022. The 2021 10-K described FFO and NFFO, stating the following, in relevant part:

> Investors and analysts following the real estate industry utilize funds from operations, or FFO, as a supplemental performance measure. FFO, reflecting the assumption that real estate asset values rise or fall with market conditions, principally adjusts for the effects of GAAP depreciation and amortization of real estate assets, which assumes that the value of real estate diminishes predictably over time. We compute FFO in accordance with the definition provided by the National Association of Real Estate Investment Trusts, or Nareit, which represents net income (loss) (computed in accordance with GAAP), excluding gains (losses) on sales of real estate and impairment charges on real estate assets, plus real estate depreciation and amortization and after adjustments for unconsolidated partnerships and joint ventures. In addition to presenting FFO in accordance with the Nareit definition, we disclose normalized FFO [NFFO], which adjusts FFO for items that relate to unanticipated or non-core events or activities or accounting changes that, if not noted, would make comparison to prior period results and market expectations less meaningful to investors and analysts.

> We believe that the use of FFO … improves the understanding of our operating results among investors and the use of normalized FFO makes comparisons of our

operating results with prior periods and other companies more meaningful FFO and normalized FFO are relevant and widely used supplemental measures of operating and financial performance of REITs … [T]he measures do not reflect either depreciation and amortization costs or the level of capital expenditures and leasing costs necessary to maintain the operating performance of our properties, which can be significant economic costs that could materially impact our results of operations.

74.     Additionally, Generally Accepted Accounting Principles ("GAAP") required the Company to record an impairment charge as soon as the Company received information that it was ***probable*** that rent payments may not be paid.[1] Instead, the Individual Defendants chose to keep investors in the dark for as long as possible, and only recorded massive impairment charges when the Company's properties ***actually*** failed to timely make rent payments.

75.     Both the Prospect Facilities and Steward were integral to the Company's overall financial health and their ability to pay rent was crucial. For these reasons, the Individual Defendants had a crucial obligation to monitor, analyze, and accurately report the financial condition of both.

76.     The Individual Defendants also represented to investors throughout the Relevant Period in the Company's public filings with the SEC that the Company "monitor[s] certain key performance indicators that we believe provide us with early indications of conditions that could affect the level of risk in our portfolio," including through monitoring "facility operating performance" and "tenants' free cash flow."

77.     Similarly, Item 303 of Regulation S-K, codified at 17 C.F.R. § 229.303, requires

---

[1] GAAP Topic 310 states that "A [receivable] is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the … agreement." To determine the probability of a receivable becoming impaired, "[A] creditor shall consider all available information reflecting past events and current conditions when developing the estimate of expected future cash flows. All available information would include existing … factors, for example, … economic … factors that are relevant to the collectability of that [receivable] and that indicate that it is probable that an asset had been impaired at the date of the financial statements."

the disclosure of "events or uncertainties" that could materially affect a company's "liquidity," "capital resources," and/or "results of operations." The Individual Defendants should have disclosed, per Item 303, that many lease payments from numerous tenants were in danger of not being timely paid, as tardy or unpaid rent payments would negatively materially affect liquidity, capital resources, and Company operations.

78.     In breach of their fiduciary duties to the Company, the Individual Defendants engaged in a vast scheme to hide from investors that the Company's asset portfolio was extremely troubled and underperforming so much so that many of the Company's facilities could not timely pay their rents. Contrary to their public statements, the Individual Defendants completed a variety of "uncommercial transactions" to save the Company's distressed assets in the near term and, consequently, avert impairment charges, thereby causing the Company's stock to trade at artificially inflated prices throughout the Relevant Period. In so doing, the Individual Defendants caused the Company to overstate FFO, NFFO, net income, and even the value of the Company's rental properties, since they prevented the Company from implementing necessary impairment charges during the Relevant Period.

79.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements and omissions about the true condition of the Company's assets, financial health, and overall business practices. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make to the investing public a series of false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company concealed the poor financial condition of its high-debt tenants, including Steward; (2) Medical Properties fraudulently transferred hundreds of millions of dollars to bail out its debt-

ridden tenants; (3) Medical Properties hid its fraudulent fund transfers by concocting fake construction projects with purportedly high capital expenses despite the fact that Medical Properties entered into "triple-net leases," which required tenants to pay a high amount of expenses, including real estate taxes, insurance, and maintenance; (4) due to the foregoing, the Company's public representations, were false and misleading; and (5) the Company failed to maintain adequate internal controls. Further, the Individual Defendants failed to adequately disclose the poor financial condition of Steward until *January 2024*, whereupon it announced that Steward owed approximately $50 million in unpaid rent and that it would record about $350 million of write-downs related to Steward, including a write-off of consolidated straight-line rent receivables of approximately $225 million and unpaid rent receivables of approximately $100 million. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### False and Misleading Statements Made During the Relevant Period

*August 1, 2019 Form 8-K*

80.     On August 1, 2019, the Company filed a Form 8-K (the "August 2019 8-K") with the SEC. Defendant Hamner signed the August 2019 8-K. The August 2019 8-K contained a press release which provided financial and operational results for the quarter and six months ended June 30, 2019. The August 2019 8-K reported net income for the second quarter of 2019 of $79.4 million ($0.20 per diluted share), compared to $111.6 million ($0.30 per diluted share) for the second quarter of 2018. The August 2019 8-K also reported FFO of $119.5 million.

81.     Additionally, the August 2019 8-K reported NFFO of $120.9 million, compared to $129.9 million in the second quarter of 2018. Per share NFFO was $0.31 per diluted share in the second quarter of 2019, compared to $0.36 per diluted share in the second quarter of 2018.

***August 9, 2019 Form 10-Q***

82.     On August 9, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Aldag and Hamner and contained certifications, signed by Defendants Aldag and Hamner, pursuant to Rules 13a- 14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 2Q19 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

83.     The 2Q19 10-Q stated the same financial results as the August 2019 8-K in ¶¶ 79-80.

***October 31, 2019 Form 8-K***

84.     On October 31, 2019, the Company filed a Form 8-K (the "October 2019 8-K") with the SEC. Defendant Hamner signed the October 2019 8-K. The October 2019 8-K contained a press release which provided financial and operational results for the quarter ended September 30, 2019. The October 2019 8- K reported net income for the third quarter of 2019 of $89.8 million ($0.20 per diluted share), compared to $736.0 million ($2.00 per diluted share) for the third quarter of 2018, resulting from $695.2 million of gains from sales.

85.     Additionally, the October 2019 8-K reported FFO of $139.3 million and NFFO of $147.5 million, compared to $127.2 million in the third quarter of 2018. Per share NFFO was $0.33 per diluted share in the third quarter of 2019, compared to $0.35 per diluted share in the third quarter of 2018.

***November 12, 2019 Form 10-Q***

86.     On November 12, 2019, the Company filed its quarterly report on Form 10-Q with

the SEC for the period ended September 30, 2019 (the "3Q19 10- Q"). The 3Q19 10-Q was signed by Defendants Aldag and Hamner and contained SOX certifications, signed by Defendants Aldag and Hamner, attesting to the accuracy of the financial statements contained in the 3Q19 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 3Q19 10Q stated the same financial results as the October 2019 8-K in ¶¶ 83-84.

### *February 6, 2020 Form 8-K*

87.     On February 6, 2020, the Company filed a Form 8-K (the "February 2020 8-K") with the SEC. Defendant Hamner signed the February 2020 8-K. The February 2020 8-K contained a press release which provided financial and operational results for the quarter and year ended December 31, 2019. The February 2020 8-K reported net income for the fourth quarter and full year 2019 of $130 million ($0.26 per diluted share) and $374.7 million ($0.87 per diluted share), respectively, compared to $78 million ($0.21 per diluted share) and $1.02 billion ($2.76 per diluted share) for the fourth quarter and full year 2018, respectively.

88.     Additionally, the February 2020 8-K reported NFFO of $171 million ($0.35 per diluted share) for the fourth quarter of 2019 and $557.4 million ($1.30 per diluted share) for Fiscal Year 2019, compared to $112 million ($0.31 per diluted share) for the fourth quarter of 2018 and $501 million ($1.37 per diluted share) for the fiscal year ended December 31, 2018. Moreover, the February 2020 8-K reported FFO of $535.8 million for Fiscal Year 2019. The February 2020 8-K also stated a $2.1 billion balance in the "Investment in Financing Leases" line item. This balance sheet item included aggregate future "lease payments receivable" that would be paid by the Prospect Facilities over the remaining leases plus the residual value of the real estate leased to the Prospect Facilities.

***February 27, 2020 Form 10-K***

89.     On February 27, 2020, the Company filed its annual report for the Fiscal Year 2019 on Form 10-K with the SEC (the "2019 10-K"). The 2019 10-K was signed by Defendants Aldag, Hamner, Dawson, Pitman, Sparks, Stewart, and Thompson and contained SOX certifications, signed by Defendants Aldag and Hamner, attesting to the accuracy of the financial statements contained in the 2019 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2019 10-K stated the same financial results as the February 2020 8- K in ¶¶ 86-87.

90.     The 2019 10-K stated the following about Medical Properties' dependence on the ability of its tenants to meet their financial obligations:

> Our relationships with these operators and their financial performance and resulting ability to satisfy their lease and loan obligations to us are material to our financial results and our ability to service our debt and make distributions to our stockholders. ***We are dependent upon the ability of these operators to make rent and loan payments to us, and*** any failure to meet these obligations could have a material adverse effect on our financial condition and results of operations.

(Emphasis added.)

91.     The 2019 10-K also stated that the Company's financial reporting was accurate and that none of the Company's facilities values were impaired, stating the following, in relevant part:

> When circumstances indicate a possible impairment of the value of our real estate investments, we review the recoverability of the facility's carrying value. The review of the recoverability is generally based on our estimate of the ***future undiscounted cash flows*** from the facility's use and eventual disposition. Our forecast of these cash flows considers factors such as ***expected future operating income***, market and other applicable trends, and residual value, as well as the effects of leasing demand, competition, and other factors. If impairment exists due to the inability to recover the carrying value of a facility on an undiscounted basis, an impairment loss is recorded to the extent that the carrying value exceeds the estimated fair value of the facility. ***We do not believe that the value of any of our facilities was impaired at December 31, 2019***; however, given the highly specialized aspects of our properties no assurance can be given that future impairment charges will not be taken.

(Emphasis added).

### *April 30, 2020 Form 8-K*

92.     On April 30, 2020, the Company filed a Form 8-K (the "April 2020 8-K") with the SEC. Defendant Hamner signed the April 2020 8-K. The April 2020 8-K contained a press release which provided financial and operational results for the quarter ended March 31, 2020. The April 2020 8-K reported net income for the first quarter of 2020 of $81.0 million ($0.15 per diluted share), compared to $75.8 million ($0.20 per diluted share) for the first quarter of 2019.

93.     Additionally, the April 2020 8-K reported NFFO of $191.2 million for the first quarter of 2020 ($0.37 per diluted share), compared to $117.8 million ($0.31 per diluted share) for the first quarter of 2019. Moreover, the April 2020 8-K reported FFO of $168.7 million. The April 2020 8-K also reported a $2.1 billion balance in the Investment in Financing Leases line item on the Company's balance sheet.

### *May 11, 2020 Form 10-Q*

94.     On May 11, 2020, the Company filed its quarterly report on Form 10- Q with the SEC for the period ended March 31, 2020 (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendants Aldag and Hamner and contained SOX certifications, signed by Defendants Aldag and Hamner, attesting to the accuracy of the financial statements contained in the 1Q20 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

95.     The 1Q20 10-Q stated the same financial results as the April 2020 8- K in ¶¶ 91-92.

### *July 30, 2020 Form 8-K*

96.     On July 30, 2020, the Company filed a Form 8-K (the "July 2020 8- K") with the

SEC. Defendant Hamner signed the July 2020 8-K. The July 2020 8- K contained a press release which provided financial and operational results for the quarter ended June 30, 2020. The July 2020 8-K reported net income for the second quarter of 2020 of $109.5 million ($0.21 per diluted share), compared to $79.4 million ($0.20 per diluted share) for the second quarter of 2019.

97.     Additionally, the July 2020 8-K reported NFFO of $199.6 million ($0.38 per diluted share) for the second quarter of 2020, compared to $120.9 million ($0.31 per diluted share) for the second quarter of 2019. Moreover, the July 2020 8-K reported FFO of $183.9 million. The July 2020 8-K also reported a $2.1 billion balance in the Investment in Financing Leases line item on the Company's balance sheet.

### August 7, 2020 Form 10-Q

98.     On August 7, 2020, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2020 (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendants Aldag and Hamner and contained SOX certifications, signed by Defendants Aldag and Hamner, attesting to the accuracy of the financial statements contained in the 2Q20 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2Q20 10-Q stated the same financial results as the July 2020 8-K in ¶¶ 95-96.

### October 29, 2020 Form 8-K

99.     On October 29, 2020, the Company filed a Form 8-K (the "October 2020 8-K") with the SEC. Defendant Hamner signed the October 2020 8-K. The October 2020 8-K contained a press release which provided financial and operational results for the quarter ended September 30, 2020. The October 2020 8-K reported net income for the third quarter of 2020 of $131.1 million ($0.25 per diluted share), compared to $89.8 million ($0.20 per diluted share) for the third quarter

of 2019.

100.    Additionally, the October 2020 8-K reported NFFO of $220.7 million ($0.41 per diluted share) for the third quarter of 2020, compared to $147.5 million ($0.33 per diluted share) for the third quarter of 2019. Moreover, the October 2020 8-K reported FFO of $212.4 million. The October 2020 8-K also reported a $2.1 billion balance in the Investment in Financing Leases line item on the Company's balance sheet.

**November 9, 2020 Form 10-Q**

101.    On November 9, 2020, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2020 (the "3Q20 10-Q"). The 3Q20 10-Q was signed by Defendants Aldag and Hamner and contained SOX certifications, signed by Defendants Aldag and Hamner, attesting to the accuracy of the financial statements contained in the 3Q20 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

102.    The 3Q20 10-Q stated the same financial results as the October 2020 8-K in ¶¶ 98-99.

**February 4, 2021 Form 8-K**

103.    On February 4, 2021, the Company filed a Form 8-K (the "February 2021 8-K") with the SEC. Defendant Hamner signed the February 2021 8-K. The February 2021 8-K contained a press release which provided financial and operational results for the quarter and year ended December 31, 2020. The February 2021 8-K reported net income for the fourth quarter and year ended 2020 of $110 million ($0.20 per diluted share) and $431.5 million ($0.81 per diluted share), respectively, compared to $130 million ($0.26 per diluted share) and $375 million ($0.87 per diluted share) for the fourth quarter and year ended 2019, respectively.

104.    Additionally, the February 2021 8-K reported FFO of $757.7 for Fiscal Year 2020. The February 2021 8-K also reported NFFO of $220 million ($0.41 per diluted share) for the fourth quarter of 2020 and $831.2 million ($1.57 per diluted share) for Fiscal Year 2020, compared to $171 million ($0.35 per diluted share) for the fourth quarter of 2019 and $557 million ($1.30 per diluted share) for Fiscal Year 2019. The February 2021 8-K also reported a $2.0 billion balance in the Investment in Financing Leases line item on the Company's balance sheet.

### March 1, 2021 Form 10-K

105.    On March 1, 2021, the Company filed its annual report for the Fiscal Year 2020 on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants Aldag, Hamner, Dawson, Mozingo, Pitman, Sparks, Stewart, and Thompson and contained SOX certifications, signed by Defendants Aldag and Hamner, attesting to the accuracy of the financial statements contained in the 2020 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2020 10-K stated the same financial results as the February 2021 8- K.

106.    The 2020 10-K stated the following about Medical Properties' dependence on the ability of its tenants to meet their financial obligations:

> Our tenants' financial performance and resulting ability to satisfy their lease and loan obligations to us are material to our financial results and our ability to service our debt and make distributions to our stockholders. ***We are dependent upon the ability of our tenants to make rent and loan payments to us, and any failure to meet these obligations could have a material adverse effect on our financial condition and results of operations.***

(Emphasis added.)

107.    The 2020 10-K also stated that the Company's financial reporting was accurate and that none of the Company's facilities' values were impaired, stating the following, in relevant part:

> When circumstances indicate a possible impairment of the value of our real estate

investments, we review the recoverability of the facility's carrying value. The review of the recoverability is generally based on our estimate of the ***future undiscounted cash flows*** from the facility's use and eventual disposition. Our forecast of these cash flows considers factors such as ***expected future operating income***, market and other applicable trends, and residual value, as well as the effects of leasing demand, competition, and other factors. If impairment exists due to the inability to recover the carrying value of a facility on an undiscounted basis, an impairment loss is recorded to the extent that the carrying value exceeds the estimated fair value of the facility. In making estimates of fair value for purposes of impairment assessments, we will look to a number of sources including independent appraisals, available broker data, or our internal data from recent transactions involving similar properties in similar markets. ***We do not believe that the value of any of our facilities was impaired at December 31, 2020***; however, given the highly specialized aspects of our properties no assurance can be given that future impairment charges will not be taken.

(Emphasis added.)

***April 26, 2021 Proxy***

108.    The Company filed its 2021 Annual Proxy Statement (the "2021 Proxy") in connection with the 2021 annual stockholders meeting. Specifically, Defendants Aldag, Dawson, Hamner, Mozingo, Pitman, Sparks, Stewart, and Thompson caused the Company to issue the 2021 Proxy, which contained material misstatements and omissions.

109.    In the 2021 Proxy, these Defendants solicited stockholder votes, to among other things: (1) re-elect themselves to the Board and (2) approve, on an advisory basis, the compensation of named executive officers. With respect to each of these solicited votes, the Defendants issued materially false or misleading statements.

110.    The 2021 Proxy stated the following regarding the Board's and the Audit Committee's risk oversight functions:

Our Board plays a central role in overseeing and evaluating risks pertinent to our Company. While it is management's responsibility to identify and manage our risk exposure on a day-to-day basis, the Board routinely discusses these risks with management and actively oversees our risk-management procedures and protocols. The Board regularly receives reports from senior management on areas of material risk to the Company, including operational, financial, legal, regulatory and strategic

risks. In addition, each of the Audit Committee, the Compensation Committee and the Ethics, Nominating and Corporate Governance Committee exercises oversight and provides guidance relating to the particular risks within the purview of each committee, as well as making periodic reports to the full Board. Our Board also oversees risk by means of the required approval by our Board of significant transactions and other decisions, including material acquisitions or dispositions of property, material capital markets transactions, significant capital improvement projects and important employment-related decisions.

111.    The 2021 Proxy also listed certain responsibilities of the Audit Committee, which at that time consisted of Defendants Dawson, Sparks, and Thompson. These responsibilities included overseeing: "(i) our accounting and financial reporting processes, (ii) the integrity and audits of our financial statements, (iii) our compliance with legal and regulatory requirements, (iv) the qualifications and independence of our independent auditors, and (v) the performance of our internal and independent auditors."

112.    The 2021 Proxy was materially misleading because it failed to disclose that: (1) contrary to the 2021 Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties; (2) the Company's ineffective internal and disclosure controls; and (3) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder advisory approval of the executive officers' compensation plan.

*April 29, 2021 Form 8-K*

113.    On April 29, 2021, the Company filed a Form 8-K (the "April 2021 8-K") with the SEC. Defendant Hamner signed the April 2021 8-K. The April 2021 8-K contained a press release which provided financial and operational results for the quarter ended March 31, 2021. The April

2021 8-K reported net income for the first quarter of 2021 of $163.8 million ($0.28 per diluted

share), compared to $81 million ($0.15 per diluted share) for the first quarter of 2020.

114.     Additionally, the April 2021 8-K reported NFFO of $243.9 million ($0.42 per

diluted share) for the first quarter of 2021, compared to $191 million ($0.37 per diluted share) for

the first quarter of 2020. Moreover, the April 2021 8- K reported FFO of $251.0 million. The April

2021 8-K also reported a $2.0 billion balance in the Investment in Financing Leases line item on

the Company's balance sheet.

### May 10, 2021 Form 10-Q

115.     On May 10, 2021, the Company filed its quarterly report on Form 10- Q with the

SEC for the period ended March 31, 2021 (the "1Q21 10-Q"). The 1Q21 10-Q was signed by

Defendants Aldag and Hamner and contained SOX certifications, signed by Defendants Aldag and

Hamner, attesting to the accuracy of the financial statements contained in the 1Q21 10-Q, the

disclosure of any material changes to the Company's internal controls, and the disclosure of any

fraud committed by the Company, its officers, or its directors.

116.     The 1Q21 10-Q stated the same financial results as the April 2021 8- K in ¶¶ 112-

113.

### July 29, 2021 Form 8-K

117.     On July 29, 2021, the Company filed a Form 8-K (the "July 2021 8- K") with the

SEC. Defendant Hamner signed the July 2021 8-K. The July 2021 8- K contained a press release

which provided financial and operational results for the quarter ended June 30, 2021. The July

2021 8-K reported net income for the second quarter of 2021 of $114.6 million ($0.19 per diluted

share), compared to $109 million ($0.21 per diluted share) for the second quarter of 2020.

118.     Additionally, the July 2021 8-K reported NFFO of $250.5 million ($0.43 per diluted

share) for the second quarter of 2021, compared to $200 million ($0.38 per diluted share) for the second quarter of 2020. Moreover, the July 2021 8-K reported FFO of $205.6 million. The July 2021 8-K also reported a $2.0 billion balance in the Investment in Financing Lease line item on the Company's balance sheet.

***August 9, 2021 Form 10-Q***

119.    On August 9, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2021 (the "2Q21 10-Q"). The 2Q21 10-Q was signed by Defendants Aldag and Hamner and contained SOX certifications, signed by Defendants Aldag and Hamner, attesting to the accuracy of the financial statements contained in the 2Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

120.    The 2Q21 10-Q stated the same financial results as the July 2021 8-K in ¶¶ 116-117.

***October 28, 2021 Form 8-K***

121.    On October 28, 2021, the Company filed a Form 8-K (the "October 2021 8-K") with the SEC. Defendant Hamner signed the October 2021 8-K. The October 2021 8-K contained a press release which provided financial and operational results for the quarter ended September 30, 2021. The October 2021 8- K reported net income for the third quarter of 2021 of $171.1 million ($0.29 per diluted share), compared to $131 million ($0.25 per diluted share) for the third quarter of 2020.

122.    Additionally, the October 2021 8-K reported NFFO of $262.8 million ($0.44 per diluted share) for the third quarter of 2021, compared to $221 million ($0.41 per diluted share) for the third quarter of 2020. Moreover, the October 2021 8-K reported FFO of $260.0 million. The

October 2021 8-K also reported a $2.0 billion balance in the Investment in Financing Leases line item on the Company's balance sheet.

***November 9, 2021 Form 10-Q***

123.    On November 9, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q was signed by Defendants Aldag and Hamner and contained SOX certifications, signed by Defendants Aldag and Hamner, attesting to the accuracy of the financial statements contained in the 3Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

124.    The 3Q21 10-Q stated the same financial results as the October 2021 8-K in ¶ 120-121.

***February 3, 2022 Form 8-K***

125.    On February 3, 2022, the Company filed a Form 8-K (the "February 2022 8-K") with the SEC. Defendant Hamner signed the February 2022 8-K. The February 2022 8-K contained a press release which provided financial and operational results for the quarter and year ended December 31, 2021. The February 2022 8-K reported net income for the fourth quarter and Fiscal Year 2021 of $207 million ($0.34 per diluted share) and $656 million ($1.11 per diluted share), respectively, compared to $110 million ($0.20 per diluted share) and $431 million ($0.81 per diluted share) for the fourth quarter and Fiscal Year 2020, respectively.

126.    Additionally, the February 2022 8-K reported FFO of $976.0 million for Fiscal Year 2021. The February 2022 8-K also reported NFFO of $279 million ($0.47 per diluted share) for the fourth quarter of 2021 and $1.0 billion ($1.75 per diluted share) for Fiscal Year 2021, compared to $220 million ($0.41 per diluted share) for the fourth quarter of 2020 and $831 million

($1.57 per diluted share) for Fiscal Year 2020. The February 2022 8-K also reported a $2.0 billion balance in the Investment in Financing Leases line item on the Company's balance sheet.

**March 1, 2022 Form 10-K**

127.    On March 1, 2022, the Company filed the 2021 10-K with the SEC. The 2021 10-K was signed by Defendants Aldag, Hamner, Dawson, Mozingo, Pitman, Sparks, Stewart, and Thompson and contained SOX certifications, signed by Defendants Aldag and Hamner, attesting to the accuracy of the financial statements contained in the 2021 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2021 10-K stated the same financial results as the February 2022 8-K.

128.    The 2021 10-K stated the following about Medical Properties' dependence on the ability of its tenants to meet its financial obligations:

> Our revenues are dependent upon our relationships with and success of our tenants, particularly our largest tenants, like Steward, Circle, Prospect, Swiss Medical Network, and HCA.
>
> ***Our tenants' financial performance and resulting ability to satisfy their lease and loan obligations to us are material to our financial results and our ability to service our debt and make distributions to our stockholders. We are dependent upon the ability of these tenants to make rent and loan payments to us, and any failure to meet these obligations could have a material adverse effect on our financial condition and results of operations.***
>
>                                * * *
>
> Any adverse result to our tenants (particularly Steward, Circle, Prospect, Swiss Medical Network, and HCA) in regulatory proceedings ***or financial or operational setbacks may have a material adverse effect on the relevant tenant's operations and on its ability to make required lease and loan payments to us…***

(Emphasis added.)

129.    The 2021 10-K also stated that the Company's financial reporting was accurate and that none of the Company's facilities' values were impaired, stating the following, in relevant part:

When circumstances indicate a possible impairment of the value of our real estate investments, we review the recoverability of the facility's carrying value. The review of the recoverability is generally based on our estimate of the ***future undiscounted cash flows*** from the facility's use and eventual disposition. Our forecast of these cash flows considers factors such as ***expected future operating income***, market and other applicable trends, and residual value, as well as the effects of leasing demand, competition, and other factors. If impairment exists due to the inability to recover the carrying value of a facility on an undiscounted basis, an impairment loss is recorded to the extent that the carrying value exceeds the estimated fair value of the facility. In making estimates of fair value for purposes of impairment assessments, we will look to a number of sources including independent appraisals, available broker data, or our internal data from recent transactions involving similar properties in similar markets. ***We do not believe that any of our facilities were impaired at December 31, 2021***; however, given the highly specialized aspects of our properties, no assurance can be given that future impairment charges will not be taken.

(Emphasis added.)

### April 28, 2022 Proxy Statement

130.    The Company filed its 2022 Annual Proxy Statement (the "2022 Proxy") in connection with the 2022 annual stockholders meeting. Specifically, Defendants Aldag, Dawson, Hamner, Mozingo, Murphy, Pitman, Sparks, Stewart, and Thompson caused the Company to issue the 2022 Proxy, which contained material misstatements and omissions.

131.    In the 2022 Proxy, these Defendants solicited stockholder votes, to among other things: (1) re-elect themselves to the Board and (2) approve, on an advisory basis, the compensation of named executive officers and the Amended and Restated 2019 Equity Incentive Plan. With respect to each of these solicited votes, the Defendants issued materially false or misleading statements.

132.    The 2022 Proxy stated the following regarding the Board's and the Audit Committee's risk oversight functions:

Our Board plays a central role in overseeing and evaluating risks pertinent to our Company. While it is management's responsibility to identify and manage our risk exposure on a day-to-day basis, the Board routinely discusses these risks with

management and actively oversees our risk-management procedures and protocols. The Board regularly receives reports from senior management on areas of material risk to the Company, including operational, financial, legal, regulatory and strategic risks. In addition, each of the Audit Committee, the Compensation Committee and the Ethics, Nominating and Corporate Governance Committee exercises oversight and provides guidance relating to the particular risks within the purview of each committee, as well as making periodic reports to the full Board. Our Board also oversees risk by means of the required approval by our Board of significant transactions and other decisions, including material acquisitions or dispositions of property, material capital markets transactions, significant capital improvement projects and important employment-related decisions.

133.    The 2022 Proxy also listed certain responsibilities of the Audit Committee, which at that time consisted of Defendants Dawson, Sparks, and Thompson. These responsibilities included overseeing: "(i) our accounting and financial reporting processes, (ii) the integrity and audits of our financial statements, (iii) our compliance with legal and regulatory requirements, (iv) the qualifications and independence of our independent auditors, and (v) the performance of our internal and independent auditors."

134.    The 2022 Proxy was materially misleading because it failed to disclose that: (1) contrary to the 2022 Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties; (2) the Company's ineffective internal and disclosure controls; and (3) the Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder advisory approval of the executive officers' compensation plan.

135.    As a result of the material misstatements and omissions contained in the 2022 Proxy, Company shareholders, *inter alia*: (1) reelected Defendants Aldag, Dawson, Hamner,

Mozingo, Murphy, Pitman, Sparks, Stewart, and Thompson to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) approved, on an non-binding advisory basis, the compensation of named executive officers; and (3) approved the Plan, thus allowing the Individual Defendants to materially benefit from the false and misleading statements contained in the 2022 Proxy.

### April 28, 2022 Form 8-K

136.     On April 28, 2022, the Company filed a Form 8-K (the "April 2022 8-K") with the SEC. Defendant Hamner signed the April 2022 8-K. The April 2022 8-K contained a press release which provided financial and operational results for the quarter ended March 31, 2022. The April 2022 8-K reported net income for the first quarter of 2022 of $631.7 million ($1.05 per diluted share), compared to $164 million ($0.28 per diluted share) for the first quarter of 2021.

137.     Additionally, the April 2022 8-K reported NFFO of $282.5 million ($0.47 per diluted share) for the first quarter of 2022, compared to $244 million ($0.42 per diluted share) for the first quarter of 2021, constituting a 12% increase on a per share basis. Moreover, the April 2022 8-K reported FFO of $279.1 million. The April 2022 8-K also reported a $2.1 billion balance in the Investment in Financing Leases line item on the Company's balance sheet.

### May 10, 2022 Form 10-Q

138.     On May 10, 2022, the Company filed its quarterly report on Form 10- Q with the SEC for the period ended March 31, 2022 (the "1Q22 10-Q"). The 1Q22 10-Q was signed by Defendants Aldag and Hamner and contained SOX certifications, signed by Defendants Aldag and Hamner, attesting to the accuracy of the financial statements contained in the 1Q22 10-Q, the

disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

139.     The 1Q22 10-Q stated the same financial results as the April 2022 8- K in ¶¶ 135-136.

**August 3, 2022 Form 8-K**

140.     On August 3, 2022, the Company filed a Form 8-K (the "August 2022 8-K") with the SEC. Defendant Hamner signed the August 2022 8-K. The August 2022 8-K contained a press release which provided financial and operational results for the quarter ended June 30, 2022. The August 2022 8-K reported net income for the second quarter of 2022 of $189.6 million ($0.32 per diluted share), compared to $115 million ($0.19 per diluted share) for the second quarter of 2021.

141.     Additionally, the August 2022 8-K reported NFFO of $274.7 million ($0.46 per diluted share) for the second quarter of 2022, compared to $251 million ($0.43 per diluted share) for the second quarter of 2021, constituting a 7% increase on a per share basis. Moreover, the August 2022 8-K reported FFO of $274.9 million. The August 2022 8-K also reported a $2.1 billion balance in the Investment in Financing Leases line item on the Company's balance sheet.

**August 9, 2022 Form 10-Q**

142.     On August 9, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2022 (the "2Q22 10-Q"). The 2Q22 10-Q was signed by Defendants Aldag and Hamner and contained SOX certifications, signed by Defendants Aldag and Hamner, attesting to the accuracy of the financial statements contained in the 2Q22 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

143.     The 2Q22 10-Q stated the same financial results as the August 2022 8-K in ¶¶ 139-

140.

***October 27, 2022 Form 8-K***

144.     On October 27, 2022, the Company filed a Form 8-K (the "October 2022 8-K")
with the SEC. Defendant Hamner signed the October 2022 8-K. The October 2022 8-K contained
a press release which provided financial and operational results for the quarter ended September
30, 2022. The October 2022 8 - K reported net income for the third quarter of 2022 of $221.8
million ($0.37 per diluted share), compared to $171 million ($0.29 per diluted share) for the third
quarter of 2021.

145.     Additionally, the October 2022 8-K reported NFFO of $272.3 million ($0.45 per
diluted share) for the third quarter of 2022, compared to $263 million ($0.44 per diluted share) for
the third quarter of 2021. Moreover, the October 2022 8-K reported FFO of $252.0 million. The
October 2022 8-K also reported a $2.0 billion balance in the Investment in Financing Leases line
item on the Company's balance sheet.

***November 9, 2022 Form 10-Q***

146.     On November 9, 2022, the Company filed its quarterly report on Form 10-Q with
the SEC for the period ended September 30, 2022 (the "3Q22 10-Q"). The 3Q22 10-Q was signed
by Defendants Aldag and Hamner and contained SOX certifications, signed by Defendants Aldag
and Hamner, attesting to the accuracy of the financial statements contained in the 3Q22 10-Q, the
disclosure of any material changes to the Company's internal controls, and the disclosure of any
fraud committed by the Company, its officers, or its directors.

147.     The 3Q22 10-Q stated the same financial results as the October 2022 8-K in ¶¶ 143-
144.

148.     The statements above were materially false and misleading for the reasons

discussed above and failed to disclose material facts necessary to make the statements not false and misleading.

**The Truth Emerges**

*January 26, 2023 Viceroy Report*

149.    The truth began to emerge on January 26, 2023 when Viceroy Research LLC, a financial research investigative firm, (defined above as "Viceroy") released a report on Medical Properties, titled "Medical Properties (dis)Trust" (defined above as the "Viceroy Report"). The Viceroy Report represented that the Individual Defendants had caused the Company to engage in "billions of dollars of uncommercial transactions with its tenants and their management teams in order to mask a pervasive revenue round-robin scheme and/or theft." The Viceroy Report described four types of "uncommercial transactions" by which "substantial portions of cash are round- tripped back to [the Company]." These transactions included sale-leasebacks, cash giveaways, bailouts, and the use of fabricated expenses pertaining to fabricated projects.

150.    The Viceroy Report reasoned that these fraudulent transactions allowed Medical Properties to "massively overstate" its assets. The Viceroy Report concluded that the Individual Defendants engaged in this scheme to hide from investors the sober fact that "***substantially all of [Medical Properties'] major tenants appear distressed.***" (Emphasis added.)

151.    As previously mentioned, the Viceroy Report explained that the Individual Defendants, through Medical Properties, deployed four distinct, but sometimes interlocking, types of transactions to complete their scheme to trick the market into believing that the Company's assets were in good condition and associated with rent-paying tenants.

152.    First, the Individual Defendants used sale-leasebacks, which allowed the Company to acquire properties on leaseback terms that required the seller of the asset to become the tenant

of the asset. On many occasions, the seller in the leaseback was financially distressed. The Viceroy Report states that the Company "appear[s] to constantly overpay for fire sale assets, sometimes by as much as 10x, which in turn allow debt-crippled tenants to meet their financial rent obligations as and when they fall due in the short term." Viceroy maintains that Medical Properties completed billions of dollars of uncommercial sale-leaseback transactions to shore up assets that were not paying rent.

153.    Second, the Individual Defendants used cash giveaways to inject Company monies into distressed assets. The Viceroy Report states that the Company "engages in various transactions with a common cast of friends in which hundreds of millions of dollars go missing. [The Company] has disappeared hundreds of millions of dollars in what appear to be fraudulent transactions." In this type of transaction, Medical Properties vastly overpays for an asset that is only worth a small portion of the overall transaction. By overpaying, the Company can clandestinely reroute some of the consideration to a "middle-man" who facilitates the transaction and thus keeps some of the consideration for themselves. Viceroy maintains that the cash giveaway transactions, through the use of brokers, allows the Company to move money clandestinely.

154.    Third, the Individual Defendants sometimes used a "run-of-the-mill bailout transaction." The Viceroy Report maintains that the Company unloaded hundreds of millions of dollars to financially distressed tenants in an effort to mask a failing tenant from being unable to pay rent. These "bailouts" permitted the Company to avoid having to record an impairment charge for its distressed assets.

155.    Fourth, and lastly, the Individual Defendants concocted a practice of having the Company "collude" with a tenant to create fake projects to hide money under the pretense of fabricated expenses. Therefore, in an effort to hide the spending of the Company's money – money

that was spent on bailouts and other uncommercial transactions – the Individual Defendants caused the Company to create costs and expenses from thin air.

156.    The expansive Viceroy Report concluded that Medical Properties' assets were "massively overstated" and that the Company "is a subprime asset rolled-up generating prime yields." Several of the Viceroy Report's "Key Takeaways" are:

- MPW has engaged in **billions of dollars of uncommercial transactions** with its tenants and their management teams in order to mask **a pervasive revenue round-robin scheme and / or theft**.

- The value of MPW's assets, as a result of capitalizing these uncommercial transactions, are **massively overstated**.

- MPW engaged in an aggressive, debt-fuelled [sic] roll-up strategy in order to affect these transactions. **We believe the true value of MPW's LTV is ~85%, creating enormous credit risk**.

- Many of MPW's tenants are severely distressed. This precedes the need to engage in revenue round-robin transactions.

- **Financial accounting gimmicks ensure MPW's management are incentivised [sic] to** continue **engaging in uncommercial transactions and possible fraud**. These align with management incentive schemes.

(Emphasis added.)

157.    The Viceroy Report also stated that the Individual Defendants were motivated to perpetuate their false and misleading financial statements due to personal financial incentives, as their performance-based compensation was tied to FFO and other financial metrics. In relevant part, the Viceroy Report stated the following:

- "Substantially all executive performance-based incentives are tied to FFO, FFO Growth, EBITDA, and 'Acquisitions.'" … M]anagement has consistently scraped the bottom of the barrel in its search for new properties and new tenants. All these transactions will look good on paper. All these transactions will qualify

executives for bonuses."

158.    Essentially, the Individual Defendants were heavily incentivized to rabidly pursue acquisitions and avoid issuing impairment charges since the impairment charges would have lowered FFO and EBITDA, which in turn would have lowered the Individual Defendants' performance-based compensation. Similarly, the Individual Defendants received more compensation for the more acquisitions they completed, so the Individual Defendants were heavily incentivized to pursue boundless and financially unhealthy acquisitions, thereby damaging the Company and its shareholders.

159.    Almost a month after the Viceroy Report was published, on February 23, 2023, the truth began to emerge. On that day, Medical Properties released its fourth quarter of 2022 and Fiscal Year 2022 results in a Form 8-K filed with the SEC, which lent support to the explosive allegations contained in the Viceroy Report.

160.    The Form 8-K disclosed that the Company was recording ***an impairment charge of $171 million pertaining to the Pennsylvania Facilities, as well as a write-off of an additional $112 million on unbilled rent to Prospect***, for a combined ***total impairment charge of $283 million.*** In particular, the Company stated the following:

> [F]ourth quarter 2022 net loss and full-year 2022 net income included a ***real estate impairment of approximately $171 million related to four properties leased to Prospect Medical Holdings ("Prospect") in Pennsylvania*** as well as a ***write-off of roughly $112 million in unbilled Prospect rent*** also included in Funds from Operations ("FFO") but excluded from normalized results.

(Emphasis added).

161.    On this news, the price per share of the Company's common stock fell $1.06 per share, from its close price of $12.20 per share on February 22, 2023, to close at $11.14 per share on February 23, 2023, representing a decline of approximately 8.7%. As the market continued to

process this newly disclosed information, Medical Properties' stock price continued to plummet.

**Subsequent Developments and Further Misleading Statements**

*March 1, 2023 Form 10-K*

162.    On March 1, 2023, the Company filed its annual report for the Fiscal Year 2022 on Form 10-K with the SEC (the "2022 10-K"). The 2022 10-K was signed by Defendants Aldag, Hamner, Dawson, Mozingo, Murphy, Pitman, Sparks, Stewart, and Thompson and contained SOX certifications, signed by Defendants Aldag and Hamner, attesting to the accuracy of the financial statements contained in the 2022 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

163.    The 2022 10-K stated the following about the $283 million impairment charge, in relevant part:

> Prospect (like other healthcare systems around the world) struggled through the COVID-19 pandemic, starting in early 2020 and continuing through much of the 2022 first quarter with the impact from the Omicron variant. Although admissions, surgeries, and ER visits are back above pre-COVID levels at their California and Connecticut properties, Prospect's four Pennsylvania facilities are still trailing. Now with the impact of higher labor and other costs due to inflation, Prospect has experienced a decline in cash flows during 2022. Prospect has been working through various restructuring plans to manage their cash flow. Some of these plans have made it to the binding commitment stage, including the expected sale of their Connecticut properties to Yale New Haven Health ("Yale") announced in October 2022, while others have not.

> Until the 2022 fourth quarter, Prospect was current on its rent and interest obligations under the various agreements. However, with ***rent and interest now past due*** and certain of Prospect's restructuring plans yet to be finalized, we recorded an approximate ***$280 million impairment charge in the 2022 fourth quarter***, as shown in "Real estate and other impairment charges, net" on the consolidated statements of net income. As part of this charge, ***we reduced the carrying value of the underperforming Pennsylvania properties by approximately $170 million (to approximately $250 million) and reserved all non-cash rent [due from Prospect] for a total of $112 million. We expect to record rent on our Prospect leases on a cash basis for the foreseeable future.***

(Emphasis added).

***April 27, 2023 Proxy Statement***

164.    The Company filed its 2023 Proxy in connection with the 2023 annual stockholders meeting. Specifically, Defendants Aldag, Dawson, Hamner, Mozingo, Murphy, Pitman, Sparks, Stewart, and Thompson caused the Company to issue the 2023 Proxy, which contained material misstatements and omissions.

165.    In the 2023 Proxy, these Defendants solicited stockholder votes, to among other things: (1) re-elect themselves to the Board and (2) approve, on an advisory basis, the compensation of named executive officers. With respect to each of these solicited votes, the Defendants issued materially false or misleading statements.

166.    The 2023 Proxy stated the following regarding the Board's and the Audit Committee's risk oversight functions:

> Our Board plays a central role in overseeing and evaluating risks pertinent to our Company. While it is management's responsibility to identify and manage our risk exposure on a day-to-day basis, the Board routinely discusses these risks with management and actively oversees our risk-management procedures and protocols. The Board regularly receives reports from senior management on areas of material risk to the Company, including operational, financial, legal, regulatory and strategic risks. In addition, each of the various Committees exercises oversight and provides guidance relating to the particular risks within the purview of each committee, as well as making periodic reports to the full Board. Our Board also oversees risk by means of the required approval by our Board for significant transactions and other decisions, including material acquisitions or dispositions of property, material capital markets transactions, significant capital improvement projects and important employment-related decisions.

167.    The 2023 Proxy also listed certain responsibilities of the Audit Committee, which at that time consisted of Defendants Dawson, Sparks, and Thompson. These responsibilities included overseeing: "(i) our accounting and financial reporting processes, (ii) the integrity and audits of our financial statements, (iii) our compliance with legal and regulatory requirements,

(iv) the qualifications and independence of our independent auditors, and (v) the performance of our internal and independent auditors."

168.    The 2023 Proxy was materially misleading because it failed to disclose that: (1) contrary to the 2023 Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties and (2) the Company's ineffective internal and disclosure controls.

169.    As a result of the material misstatements and omissions contained in the 2023 Proxy, Company shareholders, inter alia: (1) reelected Defendants Aldag, Dawson, Hamner, Mozingo, Murphy, Pitman, Sparks, Stewart, and Thompson to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2) approved, on an non-binding advisory basis, the compensation of named executive officers.

***May 10 , 2023 Form 10-Q***

170.    On May 10, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 30, 2023 (the "1Q23 10-Q"). The 1Q23 10-Q was signed by Defendants Aldag and Hamner and contained SOX certifications, signed by Defendants Aldag and Hamner, attesting to the accuracy of the financial statements contained in the 1Q23 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

171.    At this time the Company still failed to take any impairment charge or mention the financial condition of Steward, despite its knowledge of the poor financial condition of Steward.

*August 9, 2023 Form 10-Q*

172.    On August 9, 2023, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2023 (the "2Q23 10-Q"). The 2Q23 10-Q was signed by Defendants Aldag and Hamner and contained SOX certifications, signed by Defendants Aldag and Hamner, attesting to the accuracy of the financial statements contained in the 2Q23 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

173.    The Company announced that "On March 14, 2022, we completed a transaction with Macquarie Asset Management ("MAM"), an unrelated party, to form a partnership (the "Macquarie Transaction"), pursuant to which we contributed eight Massachusetts-based general acute care hospitals that are leased to Steward Health Care System LLC ("Steward"), and a fund managed by MAM acquired, for cash consideration, a 50% interest in the partnership. The transaction valued the portfolio at approximately $1.7 billion, and we recognized a gain on sale of real estate of approximately $600 million from this transaction, partially offset by the write-off of unbilled straight-line rent receivables. The partnership raised nonrecourse secured debt of 55% of asset value, and we received proceeds, including from the secured debt, of approximately $1.3 billion. We obtained a 50% interest in the real estate partnership valued at approximately $400 million (included in the "Investments in unconsolidated real estate joint ventures" line of our condensed consolidated balance sheets), which is being accounted for under the equity method of accounting. In connection with this transaction, we separated the eight Massachusetts-based facilities into a new master lease with terms generally identical to the other master lease, and the initial fixed lease term of both master leases was extended to 2041."

174.    On November 9, 2023, the Company filed its quarterly report on Form 10-Q with

the SEC for the period ended September 30, 2023 (the "3Q23 10-Q"). The 3Q23 10-Q was signed

by Defendants Aldag and Hamner and contained SOX certifications, signed by Defendants Aldag

and Hamner, attesting to the accuracy of the financial statements contained in the 3Q23 10-Q, the

disclosure of any material changes to the Company's internal controls, and the disclosure of any

fraud committed by the Company, its officers, or its directors.

175.    The 3Q23 10-Q stated in relevant part:

> Steward is current through September on its rent and interest obligations pursuant
> to the various lease and loan agreements, although a portion of September rent was
> paid in early October; similarly, a portion of October rent was paid timely and the
> remainder is expected to be paid in mid-November. Steward's cash flows from
> operations have been impacted by challenges related to revenue cycle management
> and a backlog of accounts payable. Steward's management has described to us its
> plans for continued improvements to profitability, access to working capital
> liquidity, and sales of certain non-core assets. Based on these initiatives, the
> reported profitability of Steward's operations at our facilities, our cross-defaulted
> master lease structure, and the additional security of our overall collateral interests,
> ***we believe that Steward will be able to satisfy its rental obligations over the full***
> ***term of our master leases***. However, no assurances can be given that we will not
> have any impairment charges in the future.
> (emphasis added).

176.    Contrary to the Company's statements, the Company was well aware of the

precariousness of Steward's financial condition.

177.    On January 4, 2024, after the stock market had closed, the Company issued a press

release, which was filed with the SEC on a Form 8-K.

178.    The Form 8-K disclosed that total unpaid rent under its lease with Steward is

approximately ***$50 million*** as of December 31, 2023 (exclusive of approximately $50 million that

was previously deferred and not currently payable related to the Norwood Hospital, which is under

reconstruction). ***The Company further stated it was recording a write-off consolidated straight-***

***line receivables of approximately $225 million, its approximately $25 million share of straight-***

***line rent receivables related to the unconsolidated Massachusetts partnership and consolidated***

*unpaid rent receivables of approximately $100 million (which includes the previously referenced $50 million related to the Norwood development)*.

179.    The Company further announced it had engaged Alvarez & Marsal Securities, LLC ("A&M") as its financial advisor and KTBS Law, LLP and Baker, Donelson, Bearman, Caldwell & Berkowitz, PC as legal advisors to advise the Company on its options to enable the recovery of uncollected rent and outstanding loans.  Additionally, the Company announced the establishment of a "transformation committee" comprised of newly appointed independent directors to help improve overall governance.

180.    On this news, the price per share of the Company's common stock fell $1.45, or approximately 29%, from closing at $5 per share on January 4, 2024, to close at $3.55 per share on January 5, 2024.

## The Individual Defendants' Knowledge of the Misconduct

181.    The Individual Defendants knew, or were reckless in not knowing, the distressed conditions of its tenants prior to 2022. Further, the Individual Defendants knew, or were reckless in not knowing, that the Company should have therefore recorded an impairment charge much earlier than the fourth quarter of 2022 and then again in 2024. Indeed, Medical Properties' own financial filings, third-party publications, governmental investigations, and the resignation of a trusted Company officer and co-founder, taken together, all support that the Individual Defendants knew or were reckless in not knowing that the tenants at issue could not pay their rents, and consequently, that impairment charges would have to be issued for them.

182.    For instance, the 2022 10-K stated that "Prospect … struggled through the COVID-19 pandemic, starting in early 2020 and continuing through much of the 2022 first quarter." The 2022 10-K also represented that the Pennsylvania Facilities had been suffering since 2020,

reporting that "Although admissions, surgeries, and ER visits are back above pre-COVID levels at their California and Connecticut properties, Prospect's four Pennsylvania facilities are still trailing." These statements are not the product of any new developments during the fourth quarter of 2022; rather, they were facts already known to the Individual Defendants as early as 2020. Yet, the Individual Defendants chose not to disclose them.

183.    Moreover, other entities frequently discussed the Prospect Facilities' precarious financial position and poor liquidity publicly, even before Medical Properties bought the Prospect Facilities in August 2019. For example, as reflected in the Viceroy Report, Moody's, a premier credit rating agency, downgraded the Prospect Facilities' credit rating to "junk status" in March 2019 because of "poor liquidity outlook and leverage levels." The Individual Defendants, as part of their run-of-the-mill due diligence from acquiring the Prospect Facilities, should have been aware of the Prospect Facilities' financial plight.

184.    Similarly, on July 31, 2020, the Private Equity Stakeholder Project, a nonprofit group, published an article titled "Broken Promises: Regulators Question Leonard Green's Investment in Prospect Medical Holdings." The article stated that the deal between Medical Properties and the Prospect Facilities left the Prospect Facilities worse off and further questioned Prospect's ability to pay rent to the Company for the use of its facilities, stating the following: [T]he sale-leaseback of almost all of Prospect's real estate [to Medical Properties] left [Prospect] in a worse financial position than before the transaction.

> In 2019, in an effort to pay down some of the existing $1.1 billion debt it had accrued …, Prospect sold much of its hospitals' real estate to Medical Properties Trust and leased it back. Prospect … characterized the sale-leaseback transaction as beneficial to the hospital company, though this is misleading; the sale-leaseback merely replaced debt with lease liabilities and left Prospect with fewer assets.
>
> **Prospect pays Medical Properties Trust around $116 million per year in rent. Even before COVID-19, it was not clear how Prospect would be able to pay the**

***rent it owes Medical Properties Trust*** …[2]

(Emphasis added).

185.    Just about two months later, on September 30, 2020, ProPublica published an article

titled "Investors Extracted $400 Million From a Hospital Chain That Sometimes Couldn't Pay for

Medical Supplies or Gas for Ambulances." Notably, the article referenced the Prospect Facilities'

poor liquidity and overall financial condition, stating the following:

> Paramedics for Prospect's hospital near Philadelphia told ProPublica that they've repeatedly gone to fuel up their ambulances only to come away empty at the pump. Their hospital supplied gas cards were rejected because Prospect hadn't paid its bill. A similar penury afflicts medical supplies. "Say we need 4x4 sponges, dressing for a patient, IV fluids," said Leslie Heygood, a veteran registered nurse at one of Prospect's Pennsylvania hospitals, "we might not have it on the shelf because it's on 'credit hold' because they haven't paid their creditors."

> As elsewhere, ***Prospect's failure to pay bills on time has delayed repairs and resulted in supply shortages***. At Delaware County Hospital [in Pennsylvania], veteran nurse Angela Neopolitano said … "***Creditors would not come in to fix things because the hospital owed them money***"[3]

(Emphasis added).

186.    On June 1, 2021, the Rhode Island Attorney General issued a decision concluding

that the Prospect Facilities were in poor financial condition, almost two years before the Individual

Defendants chose to record the necessary $283 impairment charge pertaining to the Prospect

Facilities.[4] The decision stated the following, in relevant part:

---

[2] "Broken Promises: Regulators Question Leonard Green's Investment in Prospect Medical Holdings," *Private Equity Stakeholder Project*, July 31, 2020 (pestakeholder.org).

[3] "Investors Extracted $400 Million From a Hospital Chain That Sometimes Couldn't Pay for Medical Supplies or Gas for Ambulances," *ProPublica*, September 30, 2020.

[4] Decision Re: Initial Application of Chamber Inc.; Ivy Holdings Inc.; Ivy Intermediate Holdings, Inc.; Prospect Medical Holdings, Inc.; Prospect East Holdings, Inc.; Prospect East Hospital Advisory Services, LLC; Prospect CharterCARE, LLC; Prospect CharterCARE SJHSRI, LLC; Prospect CharterCARE RWMC, LLC, Jun 1, 2021, https://riag.ri.gov/sites/g/files/xkgbur496/files/documents/Prospect_Chamber_Ivy _AG_HCA_Decision.pdf.

*Our investigation revealed a company [Prospect] whose … liabilities now exceed assets by over $1 billion [as of September 30, 2020]* … [T]his debt-to-asset ratio raises a concern for the Attorney General that the national company … can *become unstable*, disrupting and even threatening Rhode Island's third largest hospital system. In other words, PMH [Prospect Medical Holdings] is a system that is at risk of developing *a lack of financial ability to respond to the volatility of the healthcare market*, putting every hospital in its system ... at risk of reduction in services, sale, or closure.

*PMH … has and continues to struggle financially*. *See*, *e.g.*, PYA Report 19 (explaining that "PMH has reported *limited liquidity* and a highly leveraged position in recent fiscal years"); … During the 6- year period from … 2015 to … 2020, the company took a cumulative comprehensive loss of $603 million, and has seen its long-term debt increase from $451 million in … 2015 to almost $1.6 billion in … 2020.
What is more, the company's *ballooning debt has not always translated into enough liquidity to pay its bills* … PMH is a highly leveraged company that *continues to have large annual losses*.

PMH's ability to meet its medium- and long-term debt obligations are becoming more uncertain with each passing year.

Another metric used to gauge a company's financial health is the quick ratio. This ratio measures a company's liquidity, that is, its ability to cover short-term financial obligations such as payroll, vendor invoices, and outstanding or impending interest payments … In essence, the lower the value of this ratio, the more likely it is that a company will be unable to pay its bills … The following chart ("Table 2") plots PMH's quick ratios from … 2015 through … 2020, which are based on PMH's audited financial statements and calculated by the Attorney General's financial expert … As Table 2 shows, PMH's quick ratio was under 1.0 at the end of every Fiscal Year from 2015 to 2020, meaning that *the company had less than $1 to cover every $1 in short-term financial obligations* … The Attorney General sees this as creating a circumstance where *PMH will not be able to find operational cash when it is needed*. See Carris Report 9 ("*PMH has sold substantially all its real property [to Medical Properties] … There is very little left to leverage to provide liquidity*.") … PMH's ratio lagged the median ratio of publicly traded hospital companies, which remained over 1.0 from … 2015 to … 2019. This indicates that PMH was at a relatively higher risk of running out of cash or other liquid assets to meet its short-term financial obligations than its publicly traded counterparts.

(Emphasis added).

187. The Rhode Island Attorney General also stated that the Prospect Facilities' lease payments and loan payments to the Company worsened the Prospect Facilities' financial

predicament, noting the following:

> *A considerable portion of the … $3.1 billion in liabilities currently on PMH's books is the result of three transactions PMH entered into with Medical Properties Trust, Inc. ("MPT") in 2019* … In the first of these, PMH sold its hospitals in Connecticut, Pennsylvania, and all but one of its hospitals in California to MPT for approximately $1.4 billion. MPT then leased these hospitals back to PMH. PMH, according to its agreement with MPT, will pay rent for at least the next 15 years in order to continue operating In the second transaction, PMH took out a ~$51 million mortgage on one of its California hospitals; this mortgage is at a 7.5% interest rate per annum … And in the third transaction, PMH signed a promissory note in exchange for $113 million from MPT, referred to herein as the "TRS Note." Interest on the note is 7.5% per annum and subject to an annual escalation clause … The Attorney General has addressed this threat to the Rhode Island Hospitals' real estate by prohibiting it from being pledged or used as collateral unless approved by the Attorney General.

(Emphasis added).

188.    The Rhode Island Attorney General's expert witness even stated that the Prospect Facilities would endure a "liquidity crisis…within 18 to 24 months," stating the following, in relevant part:

> While I do not believe that *PMH faces a liquidity crisis* in the next twelve months, *I believe it will come sooner rather than later, probably within 18 to 24 months.* They cannot continue to have significant operating losses and fund necessary capital projects and expect to survive long-term.

(Emphasis added.)

189.    Moreover, the Rhode Island Attorney General's decision included several of the Prospect Facilities' 2020 and earlier financial statements, which were available to the Individual Defendants when they conducted due diligence in connection with their Prospect transactions. Critically, the financial statements demonstrated that the Prospect Facilities suffered losses of $100 million in 2020, $298 million in 2019, and $244 million in 2018. The financial statements also revealed that the Prospect Facilities' net revenue fell every year from 2018 to 2020. The remarkably poor financial condition of the Prospect Facilities financial statements coupled with

the Company's purported practice of closely watching and analyzing its tenants' financial situations, demonstrate that the Individual Defendants were aware of the Prospect Facilities' financial plight, especially in light of the sheer size of the Prospect Facilities and their overall importance to the Company's bottom line.

190.    On March 9, 2022, the Private Equity Stakeholder Project published another article on the poor financial conditions of the Pennsylvania Facilities, titled "Prospect Medical Holdings Continues to Sell Off Its Hospitals, Leaving Patient Care in Question."[5] The article found the following about the Pennsylvania Facilities: "Crozer[] … 'laid off about 100 employees earlier this month, including the executive suite … Last month, Prospect closed the maternity ward at Delaware County Memorial and suspended all inpatient services at Springfield. It is closing the 10-bed hospice unit at Taylor Hospital Friday.'"

191.    Several months later, on September 19, 2022, Credit Suisse published an analyst report that stated Prospect had a "weak liquidity profile," and went on to state the following:

> Prospect, MPW's third largest tenant . . . , reported a . . . rent coverage [ratio] of 0.6x in 2Q22.  Though a smaller tenant than Steward, this presents a much larger concern in our opinion given the dire financial situation [at Prospect], string of executive layoffs, staff shortages and recent legal action by Delaware County in Pennsylvania to force Prospect to keep essential parts of its hospitals running [There are] poor financial condition[s] and operating challenges at quite a few of the Prospect operated hospitals that are owned by MPW.

> We note that Prospect was actively seeking to sell its operations in Delaware County, Pennsylvania and in the State of Connecticut but the Delaware County, Pennsylvania transaction with ChristianaCare has fallen apart which again raises concern about potential sources of cash for Prospect to meet its obligations.

> (Emphasis added).

---

[5] "Prospect Medical Holdings Continues to Sell Off Its Hospitals, Leaving Patient Care in Question," Private Equity Stakeholder Project, March 9, 2022, (pestakeholder.org).

192.    On October 27, 2022, Defendant Aldag, in an earnings call with investors and analysts, admitted that the Pennsylvania Facilities struggled to pay rent. Indeed, when an analyst asked, "What's your confidence around that rent [from Prospect] being current going forward?" Defendant Aldag responded, "The Pennsylvania facilities are not where we would like them to be, certainly disappointed in where they are."

193.    Similarly, the Individual Defendants knew, or were reckless in not knowing, that Steward was financially distressed well before 2024, and should have acknowledged the same much earlier than it did. Moreover, their failure to acknowledge the true financial condition of Steward until January 2024 is especially brazen, as the Company should have taken extreme care to reveal the true condition of the Company and its biggest tenant, Steward, after the impairment taken in the fourth quarter of 2022 and subsequent lawsuits.

194.    For example, the Wall Street Journal published an article on February 14, 2022, discussing Steward's financial struggles, titled "How a Small Alabama Company Fueled Private Equity's Push Into Hospitals." The article first detailed how MPT financed Stewards' revenue growth between 2017 and 2019, "at times paying premium prices." "In 2019, Steward bought a West Texas Hospital for $11.7 million," selling it the same day to MPT for $26 million and "agreeing to lease it back." The article went on to state the following:

> Mr. Aldag told analysts in 2018 that Steward was on track for a "record year." When the company's financial statements came out, however, they showed Steward had actually lost around $271 million, compared with a net loss of roughly $207 million the prior year…
>
> Some of Steward's hospitals reduced services or shut their doors completely. In Youngstown, Ohio, a Steward hospital closed about a year and a half after a deal to sell its real estate to MPT. The hospital was the last to offer childbirth in the city….
>
> Despite the MPT-financed growth, Steward struggled to turn a profit. Former Steward executives said the company at times delayed paying vendors, and it has

been sued by a nurse-staffing company for allegedly withholding more than $40 million of payments, which Steward has denied…

After Covid-19 arrived, Steward told Pennsylvania's government it would shut down one of its hospitals in the state unless it received $40 million of financial relief. That hospital was saved when a local nonprofit operator agreed to buy it from Steward. Steward got more than $441 million of government relief funds in 2020, according to its financial statements, but saw its annual net loss reach $408 million….

195.    A Boston Globe article, dated January 19, 2024, entitled "Steward Health Care's financial issues could spell catastrophe for the state" publicized the fact that "[f]or years [Steward] has not filed financial disclosures that other hospitals routinely provide to the state," and noted that "even without financial disclosures, public records reveal some issues. A Globe review found, based on state court records that "Steward was the subject of at least 14 Massachusetts lawsuits filed by vendors and employees over unpaid invoices since 2022," with the sums at issue "rang[ing] from thousands to tens of millions of dollars."

196.    The Wall Street Journal further stated in a January 25, 2024, article entitled "Nation's Biggest Hospital Landlord Suffers New Losses," that "[d]uring a conference call with analysts in August, MPT's chief financial officer, Steven Hamner, said MPT planned to file Steward's 2022 financial statement once the company received them…at the request of the Securities and Exchange Commission, [with him pointing] to SEC rules requiring such disclosures if a single tenant represents a significant portion of a company's assets." However, "to date, MPT hasn't disclosed Steward's 2022 financial statements."

197.    A follow-up Boston Globe article dated January 25, 2024, entitled "Steward's medical devices were repossessed. Weeks later, a new mother died," noted that weeks prior to October 2023, the hospital's inventory of certain devices had been repossessed due to unpaid bills, and that "similar invoices had been going unpaid for more than a year throughout the nine-hospital

Steward system in Massachusetts – from elevator repair companies to staffing agencies that employ front-line workers."

198.    Finally, the American Prospect published an article on January 26, 2024, entitled "Massachusetts Wakes Up to a Hospital Nightmare," stated the following:

> Post-Cerberus, when Steward should have been in bankruptcy court, its story instead got much wilder. For some reason, de la Torre had so ingratiated himself to MPT founder/CEO Ed Aldag, whose $1.25 billion purchase of Steward's real estate had enabled Cerberus to get its requisite windfall, that MPT kept plowing money into Steward for no apparent reason. MPT financed Steward's purchases of dozens of Sun Belt hospitals and random international forays like the Malta venture, while lending money to help it make the $400 million-plus annual rent payments it owed back to MPT. The investment trust even lent de la Torre the cash to buy out Cerberus in 2021, after which the former cardiac surgeon issued Steward's shareholders—who mostly consisted of de la Torre himself—a $110 million dividend. *In all, MPT has shoveled at least $5.5 billion into Steward over the past eight years. MPT now claims it is owed $50 million in back rent by the health system, but a cash flow analysis by the REIT analyst Robert Simone, who has been covering MPT's demise for the research firm Hedgeye, suggests Steward's unpaid rent bill to MPT for the past two years alone totals at least $261 million.* (emphasis added).

## DERIVATIVE ALLEGATIONS

199.    Plaintiff brings this action derivatively to redress injuries suffered by Medical Properties as a result of the breaches of fiduciary duties violations of Section 14(a) of the Exchange Act, unjust enrichment, and waste of corporate assets, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

200.    Plaintiff owned Medical Properties stock during the time of the wrongful course of conduct constituting the basis for the claims asserted herein and continues to hold such stock.

201.    Plaintiff's stock value was significantly reduced and negatively impacted as a result of the action and/or inactions as alleged herein.

202.    Plaintiff's claim and economic position is not antagonistic to the other shareholders, whose stock value(s) were also significantly and negatively impacted by Defendants' actions

and/or inactions as alleged herein.

203.    Plaintiff will adequately and fairly represent the interests of Medical Properties and its shareholders in enforcing and prosecuting its rights, and has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

204.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

205.    A pre-suit demand on the Board of Medical Properties is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Aldag, Dawson, Hamner, Mozingo, Murphy, Pitman, Sparks, Stewart, and Thompson (the "Directors"). Plaintiff needs only to allege demand futility as to five of nine Directors who are on the Board at the time this action is commenced.

206.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

207.    Moreover, regarding Plaintiff's Section 14(a) claim in particular, demand on the Directors would be futile because each Director solicited the 2022 Proxy which, *inter alia*, called for shareholders to approve the Amended and Restated 2019 Equity Incentive Plan (defined above as the "Plan"), which also provided for an additional 16,000,000 shares to be issued in connection with approving the Plan. The misrepresentations and omissions set forth herein were material to

shareholders in voting on approval of the Plan who would not have approved the Plan had they been informed about the wrongdoing alleged herein. Under the Plan, the total annual compensation paid to any non-employee director, inclusive of cash compensation and amounts awarded under the Plan, shall not exceed $1,000,000 for that calendar year. However, as mentioned above, for the Fiscal Year 2022, Directors Dawson, Mozingo, Murphy, Pitman, Sparks, Stewart, and Thompson received $275,475, $270,475, $207,538, $285,475, $255,475, $290,475, and $270,475, respectively, in total compensation. Because Directors Dawson, Mozingo, Murphy, Pitman, Sparks, Stewart, and Thompson solicited approval for the Plan which, *inter alia*, could have more than tripled their total annual compensation, demand is futile as to them and, thus, excused.

208.    Defendants Thompson, Stewart, and Sparks (the "Compensation Committee Directors") served as members of the Compensation Committee during the Relevant Period. The Compensation Committee Directors solicited shareholder approval of the Plan, which granted them the right to determine how many shares of Company common stock to administer under the Plan to non-employee directors, including themselves. They all stood to benefit from, and did benefit from, shareholder approval of the Plan, which Company shareholders were deceived into approving while the Individual Defendants made false and misleading statements regarding the Company's operations and prospects. Thus, non-employee Directors Dawson, Mozingo, Murphy, and Pitman were beholden to the Compensation Committee Directors, and the Compensation Committee Directors were beholden to each other, because they would not take action against the very directors who held the authority to award them more than triple their total annual compensation pursuant to the Plan. These conflicts of interest precluded the Compensation Committee Directors and the rest of the Directors from calling into question the Directors and other Individual Defendants' conduct. Thus, demand upon the Compensation Committee Directors

would be futile.

209.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Directors caused the Company to fail to maintain internal controls over financial reporting and to fail to maintain effective disclosure controls and procedures. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

210.    Additional reasons that demand on Defendant Aldag is futile follow. Defendant Aldag is a co-founder of the Company and has served as the Chairman of the Board, CEO, and President since the Company's inception in 2003. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Aldag with his principal occupation for which he receives spectacular compensation. For instance, Defendant Aldag has received more than $67 million in compensation from the Company between 2019 and 2022. As the Company's highest and most trusted officer and director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Aldag signed, and thus personally made, the false and misleading statements contained in the 2019, 2020 and 2021 10-Ks. Moreover, the 2021, 2022 and 2023 Proxy statements were solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board and to the shareholders approving the Plan, which he improperly benefitted from. His insider sales made before the fraud was exposed, which coincided with Defendants' false and misleading statements

referenced herein, yielded ***approximately $37.6 million in proceeds*** and demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Aldag is a defendant in the Securities Class Action. For these reasons, Defendant Aldag breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

211.    Additional reasons that demand on Defendant Dawson is futile follow. Defendant Dawson has served as a Company director since 2004. He also serves as Chair of the Audit Committee and as a member of the Investment Committee. Defendant Dawson signed, and thus personally made, the false and misleading statements contained in the 2019, 2020 and 2021 10-Ks. Moreover, the 2021, 2022 and 2023 Proxy statements were solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board and to shareholders approving the Plan, which he improperly benefitted from. His insider sale before the fraud was exposed, which coincided with him and the Company making false and misleading statements, yielded approximately $135,091 in proceeds and demonstrate his motive in facilitating and participating in the fraud. As a trusted director throughout the Relevant Period, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also receives handsome compensation from the Company. Moreover, he served as a member of Medical Properties' Audit Committee and, in that capacity, he failed to oversee, *inter alia*, the integrity of the Company's financial statements, the Company's internal control over financial reporting, and the effectiveness of its disclosure controls and procedures, as he was required to do under the Audit Committee Charter. For these reasons, Defendant Dawson breached his fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212.    Additional reasons that demand on Defendant Hamner is futile follow. Defendant Hamner has served as a Company director since 2005 and as the Company's Executive Vice President and CFO since 2003. Therefore, as the Company admits, he is a non-independent director. He also currently serves as a member of the Investment Committee and the Risk Committee. He receives lavish compensation for his role, amounting to over $34 million between 2019 and 2022. Defendant Hamner signed, and thus personally made, the false and misleading statements contained in the 2019, 2020 and 2021 10-Ks. The 2021, 2022, and 2023 Proxy statements were solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board and to shareholders approving the Plan, which he improperly benefitted from. His insider sales made before the fraud was exposed, which coincided with he and the Company making false and misleading statements, yielded approximately ***$18.5 million in proceeds*** and demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Hamner is a defendant in the Securities Class Action. As a trusted Company director and the CFO, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Hamner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213.    Additional reasons that demand on Defendant Mozingo is futile follow. Defendant Mozingo has served as a Company director since February 2020. She also serves as Chair of the

Environmental and Social Committee and as a member of the Risk Committee. Defendant Mozingo signed, and thus personally made, the false and misleading statements contained in the 2020 and 2021 10-Ks. The 2021, 2022, and 2023 Proxy statements were solicited on her behalf, and the false and misleading statements contained therein contributed to her reelection to the Board and to the shareholders approving the Plan, which she improperly benefitted from. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Mozingo breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

214.    Additional reasons that demand on Defendant Murphy is futile follow. Defendant Murphy has served as a Company director since February 2022. She also serves as a member of the Ethics Committee, the Nominating and Corporate Governance Committee, and the Environmental and Social Committee. The 2022 and 2023 Proxy statements were solicited on her behalf, and the false and misleading statements contained therein contributed to her reelection to the Board and to shareholders approving the Plan, which she improperly benefitted from. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Murphy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

215.     Additional reasons that demand on Defendant Pitman is futile follow. Defendant Pitman has served as a Company director since 2018. She also serves as Chair of the Nominating and Corporate Governance Committee, Chair of the Risk Committee, as a member of the Ethics Committee, and as a member of the Environmental and Social Committee. Defendant Pitman signed, and thus personally made, the false and misleading statements contained in the 2019, 2020 and 2021 10-Ks. The 2021, 2022, and 2023 Proxy statements were solicited on her behalf, and the false and misleading statements contained therein contributed to her reelection to the Board and to shareholders approving the Plan, which she improperly benefitted from. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Pitman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

216.     Additional reasons that demand on Defendant Sparks is futile follow. Defendant Sparks has served as a Company director since 2014. He also serves as a member of the Audit Committee, Compensation Committee, and Investment Committee. Defendant Sparks signed, and thus personally made, the false and misleading statements contained in the 2019, 2020 and 2021 10-Ks. The 2021, 2022, and 2023 Proxy statements were solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board and to shareholders approving the Plan, which he improperly benefitted from. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over

reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he served as a member of Medical Properties' Audit Committee and, in that capacity, he failed to oversee, *inter alia*, the integrity of the Company's financial statements, the Company's internal control over financial reporting, and the effectiveness of its disclosure controls and procedures, as he was required to do under the Audit Committee Charter. For these reasons, Defendant Sparks breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

217. Additional reasons that demand on Defendant Stewart is futile follow. Defendant Stewart has served as a Company director since 2016. He also serves as a member of the Environmental and Social Committee, Compensation Committee, and Ethics Committee. Defendant Stewart signed, and thus personally made, the false and misleading statements contained in the 2019, 2020 and 2021 10-Ks. The 2021, 2022, and 2023 Proxy statements were solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board and to shareholders approving the Plan, which he improperly benefitted from. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Stewart breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

218. Additional reasons that demand on Defendant Thompson is futile follow. Defendant Thompson has served as a Company director since 2016. He also serves as a member of the Audit Committee and Investment Committee. Defendant Thompson signed, and thus

personally made, the false and misleading statements contained in the 2019, 2020 and 2021 10-Ks. The 2021, 2022, and 2023 Proxy statements were solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board and to shareholders approving the Plan, which he improperly benefitted from. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he served as a member of Medical Properties' Audit Committee and, in that capacity, he failed to oversee, *inter alia*, the integrity of the Company's financial statements, the Company's internal control over financial reporting, and the effectiveness of its disclosure controls and procedures, as he was required to do under the Audit Committee Charter. For these reasons, Defendant Thompson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

219.    Additional reasons that demand on the Board is futile follow.

220.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and its shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

221.    The Audit Committee Defendants, consisting of Defendants Dawson, Sparks, and Thompson, served as members of Medical Properties' Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants

are responsible for, *inter alia*, overseeing accounting and financial reporting processes, and reviewing and discussing with management major issues regarding accounting principles and financial statement presentations, as well as major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies. The Audit Committee Defendants failed to adequately oversee the Company's reporting processes, failed to remediate major issues regarding accounting principles, financial statement presentations, and identify or remedy deficiencies with the Company's internal controls, and failed prevent the Company from issuing false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested or independent, and demand is excused as to them.

222.    The Directors violated the Code of Conduct, Company policy, the Guidelines, the Audit Committee Charter, and the Company's other corporate governance documents by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, violations of the Exchange Act, and failing to report the same. Further, in violation of the Code of Conduct and the Company's policies, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with applicable laws and regulations.

223.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for the Company the damages the Company suffered and will continue to suffer thereby.

Thus, any demand upon the Directors would be futile.

224.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

225.    The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

226.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of the Company. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Directors or certain of the officers of the Company, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

227.    If there is no directors' and officers' liability insurance, then the Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

228.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Defendants for Violations of Section 14(a) of the Exchange Act**

229.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

230.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

231.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statements shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

232.    Under the direction and watch of Defendants Aldag, Dawson, Hamner, Mozingo,

Pitman, Sparks, Stewart, and Thompson, the Company's 2021, 2022, and 2023 Proxy statements failed to disclose, *inter alia*, the wrongdoing described above, that the Company failed to maintain adequate controls and oversight to prevent such wrongful conduct, thus rendering the Proxies false and misleading. The Individual Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder advisory approval of the executive officers' compensation plan.

233.    In the exercise of reasonable care, the Defendants should have known that by misrepresenting or failing to disclose material facts described herein, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to the Company's shareholders in voting on matters set forth for shareholder determination in the Proxies, including the election of directors, advisory approval of the executive compensation, and ratification of the Company's independent auditor.

234.    The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the Proxies.

235.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

236.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

237.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

238.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

239.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breaches of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the Company's rights and interests.

240.    In breach of their fiduciary duties owed to the Company, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company concealed the poor financial condition of its high- debt tenants, including Steward; (2) Medical Properties fraudulently transferred hundreds of millions of dollars to bail out its debt-ridden tenants; (3) Medical Properties hid its fraudulent fund transfers by concocting fake construction projects with purportedly high capital expenses despite the fact that Medical Properties entered into "triple-net leases," which required tenants to pay a high amount of expenses, including real estate taxes, insurance, and maintenance; (4) due to the foregoing, the Company's public representations, were false and misleading; and (5) the Company failed to maintain adequate internal controls. Further, the Individual Defendants failed to adequately disclose the poor financial condition of Steward until *January 2024*, whereupon it announced that Steward owed approximately $50 million in unpaid rent and that it would record about $350 million of write-downs related to Steward, including a write-off of consolidated straight-line rent receivables of approximately $225 million and unpaid rent receivables of approximately $100 million.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

241.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

242.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls and effective disclosure controls and procedures.

243.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

244.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

245.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, the Company has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

246.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Unjust Enrichment Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.**

247.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

248.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of the Company, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

249.     Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance- based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary and contractual duties.

250.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## FOURTH CLAIM

**Against the Individual Defendants for Abuse of Control Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.**

251.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

252.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

253.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

254.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

255.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly-held corporation.

256.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained, and will continue to sustain, significant damages.

257.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

258.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

259.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

260.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

261.    As a result of the foregoing, and by failing to properly consider the interests of the

Company and its public shareholders, the Individual Defendants have caused the Company to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

262.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

263.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## SEVENTH CLAIM

### Contribution And Indemnification against all Individual Defendants

264.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

265.    The Company is alleged to be liable to various persons, entities and/or classes by virtue of the same facts as are alleged herein.

266.    The Company's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Defendants as alleged above. The Company is entitled to contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are or may in the future be asserted by virtue of the Individual Defendants' misconduct.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Medical

Properties, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to the Company;

(c)     Determining and awarding to the Company the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post- judgment interest thereon;

(d)     Directing the Company and the Individual Defendants to take all necessary actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and actions as may be necessary to ensure proper corporate governance policies.

(e)     Awarding the Company restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: February 16, 2024

Respectfully submitted,

*/s/ Andrea R. Gold*
Andrea R. Gold (Bar No. 18956)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue NW, Suite 1010
Washington, DC 20006
Telephone: (202) 973-0900
agold@tzlegal.com

Marc H. Edelson, Esq. (*pro hac vice* forthcoming)
Eric Lechtzin, Esq. (*pro hac vice* forthcoming)
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N-300
Newtown, PA 18940
Telephone: 215-867-2399
medelson@edelson-law.com
elechtzin@edelson-law.com

Michael K. Yarnoff, Esq. (*pro hac vice* forthcoming)
**KEOHE LAW FIRM, P.C**.
2001 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 792-6676
myarnoff@kehoelawfirm.com

*Counsel for Plaintiff*